Hana Financial, Inc. v. Hana Bank Good morning, Your Honors. My name is Enoch Leung, and I represent Hana Financial, Inc. I hope to discuss two issues this morning. First, I would like to point out four key tribal issues of fact that precluded summary judgment in Hana Bank's favor on the priority issue. Second, even if Hana Bank had priority in 1994 to foreign exchange and wire transfer services, the scope of that priority still needs to be decided. We will submit on the briefs on the remaining issues, and with the Court's permission, I would like to reserve two minutes for rebuttal time. Well, let me ask you this. If you look at Hana Financial's mark, Hana means what, one? It means one or first, Your Honor. One or first, okay. First bank. First financial. And then you look at Hana Bank, you look at their logo. We have this little design there with a circle, and this is Cup of Arms, and Inverted U appears to be dancing. And it just seems to me that any confusion, that the bank and the financial designate the same sources. It's very minimal, remote. Why doesn't that take care of this? Well, Your Honor, the likelihood of confusion issue under the sleep craft factors, it's not just looking at the logos. For example, when somebody says, I work for Hana Financial, there could be confusion, and there has been instances of actual confusion where people have asked Hana Financial employees, oh, is that affiliated with Hana Bank? Well, some people say, well, I work for First Financial. I work for First National Bank or First Bank. That happens all the time. That is correct, Your Honor. People know that there's some similarities in names. And logos are spread all over the place. I understand, Your Honor. On top of that, the case does not just revolve around Hana Financial's logo versus Hana Bank's logo. On top of the oral confusion, there's also a claim against Hana Financial Group, which is the parent company of Hana Bank. And Your Honor is assuming that when people say Hana Financial versus Hana Bank, that the relevant market automatically knows that that means First Financial or First Bank. However, the relevant market today, after Hana Bank entered the United States market post-2002, is not just limited to Korean citizens living in the U.S. or even U.S. citizens of Korean descent that live in the U.S. The market today is for all U.S. residents, whether they understand Korean or not. Now, U.S. residents don't understand that Hana, H-A-N-A, means first or one in Korean. To U.S. residents, Hana would be an arbitrary term that could be easily confused between Hana Bank and Hana Financial. Well, frankly, I was confused in reading the briefs. I was confused. I mean, I don't – the issues – the key issue is priority of use, right? That is correct, Your Honor. All right. So the district court found the priority of use as to – for Hana Bank as of, what, August 1994? The district court found priority of use for Hana Bank as of July 12, 1994, Your Honor. All right. And what was wrong with that finding? Well, Your Honor, that finding was based upon a number of disputed issues of fact that should be tried to a jury under the tactile teletrack factors. Okay. And so if you were to go through those, it was whether, in fact, they did use the mark and the name. I mean, what's the difference that they didn't? Whether, in fact, Hana Bank did use the Hana Bank mark in Congress in the United States is a disputed issue of fact. For example, Your Honor. Well, isn't it undisputed that it was used at least with respect to – not for banking services, which they weren't licensed for until 2002, but it was used for foreign exchange and other types of financial services? That is correct, Your Honor, except the extent and amount of that use under tactile teletrack is a disputed issue of fact that a jury should decide. For example, the district court found it persuasive that Hana Bank allegedly had 10,000 customers that were members of the Hana Overseas Club between 1994 and present. However, that evidence internally self-contradicts because those 10,000 members, according to S.E.R. 71, were supposedly U.S. citizens that were no longer living in Korea. Hana Bank's own evidence indicates that U.S. citizens can never be a part of the Hana Overseas Club, and that's S.E.R. 633. You have to be a Korean citizen that's a permanent resident of the United States in order to join the club. So viewing that evidence in a light most favorable to Hana Financial, the district court should have found that Hana Bank did not have any members that were part of the Overseas Club in the United States before 2002 when it first got its U.S. banking license. And if it didn't have any members, even though there was evidence of an advertisement? That's correct, Your Honor. Advertising alone is not enough to establish trademark rights. In a service market, under a pactual teletrauma. There were the two applications. Are you saying that did you put in contrary evidence, or did you say it was your position that what they argued just wasn't sufficient for summary judgment? We argued that what they put in was not sufficient for summary judgment when viewed in the light most favorable to Hana Financial. For example, the applications you mentioned, Your Honor. They claim that they started the advertising July 12, 1994, and that by November 1994, they got their first U.S. application. But if you look at that evidence, Your Honor, that's SER 641 to 646. That applicant actually listed an address in Korea as his correspondent address. The only link to the United States is that the passport, which was a Korean passport, was issued in New York. Viewed in a light most favorable to us, that doesn't mean that that application came from the United States when he's listing a Korean address. It could be a Korean citizen was on vacation in New York, lost his or her passport, and had to get a replacement in New York. So these membership applications, these alleged members of the club that were in the U.S. from 1994 until 2002, when viewed in a light most favorable to Hana Financial, didn't really exist. They weren't in the United States. As another example, Hana Bank claims that they remitted more than $37 million on behalf of overseas club members in the United States. But if you look at the evidence, Your Honor, it's SER 71. The declaration clearly says since 2002, we have remitted in excess of $37 million. There's no evidence that a single penny, a single dollar was ever remitted from or to the United States on behalf of Hana Bank members in the United States prior to 2002. And, in fact, they couldn't have remitted that money because they didn't have a banking license until 2002. Unless the — Did the district court rule on your evidentiary objections? I don't believe the district court did, Your Honor. Okay. Unless the court has further questions about the factual teletrack factors, I would like to turn to a discussion of the scope issue. Hana Bank would have this court rule, okay, even assuming that all those facts were true, that they had 10,000 customers, that they remitted $37 million prior to obtaining their banking license, even if all that was true, Hana Bank would have this court rule that money transfer and foreign exchange gives them priority to retail banking and investment banking at large. That's simply not the case because that means the financial services are all one group. The TTAB in the American Express case, which was cited by both parties in our briefs, made a clear distinction between overseas banking and foreign remittance services, which they give priority to American Express, versus investment and security services, which include investment banking services, which they give priority to the American Stock Exchange. So the TTAB in this American Express case, which was cited by both sides, clearly draws a distinction. You can't just say because I did one financial service prior to 2002, I get rights to all financial services after 2002. In fact, the pre-2002 services that Hana Bank was engaged in were not licensed banking services because they didn't have a license. They had to go through correspondent U.S. banks. In other words, they're members of their overseas clubs, if any, in the United States. When they ask for money from Hana Bank to be transmitted from Korea, they actually have to go to Bank of America to get that money. That's because Hana Bank did not have a footprint. It did not have any use in the United States prior to 2002. Hana Bank argues that this is a new argument on the scope issue. However, it was raised below in the district court briefing, and that's at ER 383. It was also raised in Hana Financial's opening brief at pages 26 to 27. And at both places, Hana Financial provided reasoning, analysis, and case sites on those issues. Unless the Court has any questions here, I would like to raise one more issue. And that is to point out that on August 24, 2009, less than six weeks ago, the Ninth Circuit decided a new case called One Industries v. O'Neill Distributing. This One Industries case held that a user that's trying to reach back in time to rely on priority can only do so if the two marks are virtually identical. Now, that's the first time the Ninth Circuit came up with this virtual identity standard. That's what Hana Bank is trying to do here. They're trying to say, because I used the Hana Overseas Club back in 1994 on unlicensed services, today I can use Hana Bank in 2002 for all retail and investment banks. However, it is an issue of fact for the jury to decide whether Hana Bank and Hana Overseas Club are virtually identical. So did you cite that case in your brief? No, Your Honor, because this case only came out six weeks ago. So what's the name of it, and do you have a citation? It's One Industries Ninth v. O'Neill Distributing. And the citation, Your Honor, is 578 F. 3rd, 1154, August 24th, 2009. And are you using this in support of your position that they should not be able to set aside your trademark, or are you using it in support of your basic position? We are using it both for the appeal and the cross-appeal, Your Honor. And unless Your Honor has questions about the cross-appeal, I would like to reserve my time for rebuttal. But if you have questions about the cross-appeal, I'm happy to answer them. No. How does it affect your direct appeal? Because, Your Honor, the district court assumed that Hana Overseas Club, which was used in 1994, gave Hana Bank priority to use Hana Bank and Hana Financial Group post-2002. The One Industries case holds that if you're going to try to reach back in time from 2002 to 1994, the two marks have to be virtually identical. And in the One Industries case, the issue was the letter O. One was an angled O and one was a circled O. And the district court held that O'Neill Industries could not use the circle O to reach back, could not use the angled O to get priority for the circle O. So in this case, we would submit, Your Honor, that Hana Bank cannot reach back and use the Hana Overseas Club mark from 1994 to claim priority. All right. The citation that you gave us, a good idea to take one of our gum sheets and fill it out and say, we have a rule on that. Oh, thank you, Your Honor. Good morning. May it please the Court. Carlo VandenBos of Sheppard, Moen, Ricker, and Hampton for the appellees and cross-appellants Hana Bank and Hana Financial Group. I'll refer to them collectively as Hana Bank for convenience. Your Honors, I fully agree this is a case strictly about trademark priority as governed by the law. You have to talk a little louder. We agree, Your Honor, that this is a case of priority, of trademark priority, which is governed by the standard first and fourth in the teletrack case in the circuit. And that case clearly dictates that one must look at the totality of the circumstances to determine trademark priority. In the present case, the undisputed facts show that Hana Bank first published an advertisement in the United States in July of 1994. And following that initial advertisement, it has conducted continuous commerce and continuous efforts towards promoting. That advertisement was in the name of what? It advertised that the Hana Overseas Club. Right, it advertised Hana Overseas Club to Korean Americans in Los Angeles. In Los Angeles, okay. So to a Korean American who presumably understood the language, right, it would be First Overseas Club, right? At the time, Your Honor, Hana Bank was already established as one of the largest financial institutions in Korea. Right, but to me that's irrelevant because we're talking about, we have to look at the commerce in the United States. Correct. So Hana Overseas Club to Korean Americans who understood the language would be First Overseas Club. It would translate to First Overseas Club, albeit with caveat that the consumers perceiving that advertisement would understand that it related to the Hana brand with which they were already familiar as Korean expatriates. Hana Bank, the Hana financial brand. But the U.S. law would not recognize that because whatever business Hana Bank was doing in Korea would not be, it would not have trademark protection in the United States. Well, Your Honor, there is a limited doctrine that recognizes famous foreign marks. It was first described by Justice Kleinfeld in this circuit's Grupo Gigante case. Right, right. But are you proceeding under that?  Yes, I think so. So just to, I'm trying to just isolate. So you had the Hana Overseas Club to Korean Americans. Then in 2002 when you acquired Seoul Bank, you started using the Hana Bank for everything. That's when we first opened a local branch in the United States under the name Hana Bank. Right. Now that, Mark, that wasn't limited to Korean Americans, those services, right? Those were open to anybody, regular banking services. That's correct, Your Honor. So if you had an ATM and I was walking by and I needed to get money, I could go there not knowing whether Hana meant first or not first. Sure. From that point forward, we were in fact licensed to provide general banking services in the U.S. Before that time, we were not licensed to provide those types of services. However, the company was providing general financial services to the members of its overseas club. Not banking services. Correct. Financial remittance, wire transfer services, asset management services, and the like. It's important to bear in mind that the consumers who were residents of the United States at that time were turning to the trust that was conveyed by the goodwill attached to the Hana mark to partake in those services. For a while between 1994 and 2002, we were using intermediary banks in the United States, but it was a seamless transaction to the U.S. consumers. Did you establish that before the district court that the people who were using your services were associated, that the Hana Overseas Club was associated with Hana Bank and that it was partaking of Hana Bank's goodwill? We established that the Hana Overseas Club was a program being offered by Hana Bank. Well, you established one advertisement and two applications. Yes. Those were the anchoring events, if Your Honor looks at the Teletrac case, which I know you're familiar with. In that case, priority was conferred based upon some initial PR activities for certain services. The services themselves were first provided on a test basis some nine months later, and the first sale did not occur until some eight months after that. Right, but there was a sale. See, one of the problems that I have is that the only evidence of these so-called 10,000 customers and sales and business is in declarations, which your opponent attacked as hearsay and lacking foundation and other sorts of evidentiary objections, and which the district court never ruled on those. And, frankly, I might tend to say that some of those statements were hearsay and seemed to lack foundation. So I don't know about the – I don't know – I actually don't know how the district court judge could have made those – I'm not saying that you should win or lose. I'm just saying I don't know how the judge could make those determinations without having some understanding of what evidence it was considering to underlie those determinations. There were no separate evidentiary motions filed by the appellants at the district court level. There were some objections made as part of the summary judgment briefing, but there was no separate motion to be addressed by the court. There doesn't need to be a motion. It just has to be evidentiary objections. And the so-called statement of undisputed facts, they're all disputed. I mean, if you keep reading, all the key facts that underlie the district court's determination seem to be disputed or subject to an evidentiary objection. When I look at the purported disputes as to those facts, I don't perceive them so much as disputed, disputes on the facts themselves, but disputes on the conclusions to be drawn from the facts. The undisputed fact is that we did publish this advertisement in July of 1994. Within weeks, we received customer inquiries. Within four months, we had approved an application from a U.S. resident, and thereafter we continued to engage in active commerce with U.S. residents. I should address the notion that the evidence only shows transactions from 2002 to the present. In fact, the evidence shows that due to record keeping, we couldn't reach back to prove who was, in fact, a member before 2002, but we could prove that the individuals referenced in the evidence had been prior members of the overseas club, yet the documents only reflected the amount of transactions following that date. Well, it seems to me there's a lot of disputed underlying facts, and that the district court resolved them on summary judgment without viewing them in the light most favorable to the nonmoving party. I guess that's the – that really is my issue with this. I don't know how he – and he's not supposed to be resolving undisputed facts, right? That's correct, Your Honor, but I believe to some extent we're mixing up genuine disputes with evidentiary issues which are governed by the abuse discretion standard, and I'm uncertain. No, no, on summary judgment, you have to have undisputed evidence, right? And they either dispute or make an evidentiary objection which wasn't ruled upon. I believe it was implicitly ruled upon when the judge – Oh, you're making an it was implicitly ruled upon argument? Okay. So, Your Honor, I come back to the teletract standard and the totality of the circumstances there are multiple evidentiary bases upon which we conclude that the July of 1994 advertisement suffices to anchor the priority date, given that there are many instances of documents that show continued commerce under the HANA brand following that date. HANA Overseas Club. That's correct. But HANA Overseas Club in this instance I would liken to, you know, Wells Fargo Bank, Wells Fargo Mortgage Loans, et cetera. It has a fairly descriptive suffix, and the central source identifier, the central brand, if you will, is HANA in this case. Yeah, well, I mean, I was confused until I realized that the marks don't really look very much alike if you're looking at the marks. And then the learning that HANA meant one, you know, the strength of the mark, if HANA is viewed as arbitrary, the strength is really strong. If HANA is viewed as one, then there's not much strength to that mark. Well, we certainly agree, Your Honor, that there's no basis for the infringement claim. This is just one of those extraordinary circumstances where we as a defendant were able to prove senior use, and that resolved the entire issue without having to go into the likelihood of confusion test. But if we were to get into that test, I certainly agree, given the nature of the brands themselves and the type of usage, that there would be no basis, no separate basis for the infringement claims that are being asserted against HANA Bank. Your Honor, one of the challenges to the use in commerce that I would like to address here is the challenge that says because the services were provided from Korea, they do not constitute use in commerce in the United States, even though the consumers benefiting from the services were residents in the United States. I would liken this to a scenario where someone abroad, say in Belgium, for instance, opens a retail website to sell chocolates, and that company has no offices in the United States. It has servers which are housed purely in Europe. The only contact with the United States is that American consumers can go on the website, buy the chocolates, which are then shipped into U.S. commerce. I don't think anyone would reasonably dispute that in that case, the Belgian company does not possess bona fide U.S. trademark rights. Right, and that's a direct transaction between the person in the United States and the Belgian company. That's right. But the fact in dispute in this case is that since HANA Bank couldn't really do business in the United States, it used U.S. banks that actually transacted the business in the United States. And that's a question I have. Did that occur, or was there direct business? And if there was direct business, is there any evidence of that other than declarations that were subject to objection? The direct evidence there is the applications that we submitted, which proved the direct relationship between HANA Bank and the U.S. residents who are signing up to the program. So that would be, it wouldn't be the transfer of funds. It would be solely the application for. Well, it would be the transfer of funds as well. All of this again. The transfer of funds, did that go through U.S. banks or not? Prior to 2002, it does go through U.S. banks. But, again, from the consumer's perspective, these being Korean expatriates, they were relying upon the goodwill associated with the HANA name to partake in these services. From their perspective, that was, HANA Bank was providing the services in a fairly seamless fashion. Okay. Can you give me the ER numbers of the two applications? We can in just a moment, Your Honor. All right. Your Honor, while we look that up, if I may also address a follow-up argument that the opponents made, that somehow HANA Bank's use in commerce did not amount to trademark use or bona fide commercial use because it was provided only to Korean citizens living in the United States. I'll point out there's no support for that proposition whatsoever. I would agree with you on that one. The question is whether the commerce was in the United States, not whether it was with United States citizens. Right. And if Your Honor would look at the definition of use in commerce in the Lanham Act, it talks about rendering services in the U.S., which implicitly includes this notion of conveying services to people within the United States. Appellant in its argument will often talk about providing services in the U.S., which is not the statutory standard and which has a different implication altogether. Okay. And then one other argument they make to attack our evidence is to say that the initial advertisement in July of 1994 constituted a de minimis use of the trademark. And it is undisputed, again, that this advertisement didn't run. That goes against the Teletrek standards because that advertisement anchored a priority date, and so long as the evidence showed a bona fide ongoing commercial use of the mark, that should suffice. In fact, the non-prevailing party in Teletrek had engaged in some initial advertising, but the court there concluded that there was no subsequent bona fide sales of the product or services other than what appeared to be some giveaways to friends. I presume it was implicit there that the party had abandoned the trademark. With the few minutes I have left, if I could be brief. You don't have a few minutes left. With the one minute I have left. You don't even have one minute left. You're one minute over. Oh, I'm sorry. If the Court will indulge me to briefly address the counterclaim for cancellation of the trademark registration. Go ahead. With respect to the cancellation claim. Do you really want the counterclaim if you prevail on the basic claim? Judge Anderson asked me the same question. I said, no, Your Honor, I do not. All right.     Would that be your recommendation, because a fact finder could decide that it will such a child. So if we decide the primary claim in your favor, we can end the case that way. That's correct, Your Honor. Thank you very much, and I will provide that site. Thank you. You can put it on your gun sheet. Two quick points, Your Honor. First, to answer your question, the SER site is 478 to 479, which lists 22 customer applications, allegedly from the United States, for the Hanna's Overseas Club. Only 11 of those were prior to 2002, and only one of those is prior to our first interstate of April 1995, which is the one that we challenge as not even coming from the United States. Now, which ER is the one that's pre-your registration date? SER 641 to 646, Your Honor. And SER 478 to 479 is a table of the applications with the dates that they were received by Hanna Bank. The second point, Your Honor, is even assuming that Hanna Bank was engaging in interstate or foreign commerce that meets the Commerce Clause under the NANIM Act, there are disputed issues of fact under the tactile teletrack factors that should not have been resolved in their favor, such as the 10,000 customer applications issue. Mr. VandenBosch indicated that the disputes are under the conclusions to be drawn from the facts. That's exactly why summary judgment should be reversed, because those disputes on summary judgment should have been resolved in Hanna Financial's favor, not in Hanna Bank's favor. Unless the Court has further questions, Your Honor, Hanna Financial would like to submit. Very well. The matter is submitted, and the Court will take a brief recess. Thank you, Your Honor. All right. Thank you both for a good argument.
judges: Pregerson, Reinhardt, Wardlaw